## State of Minnesota

| | |
|---|---|
| County | Hennipin |

## District Court

| | |
|---|---|
| Judicial District: | Fourth |
| Court File Number: | |
| Case Type: Product Liability/Personal Injury | |

**MATTHEW FRANCO,**
Plaintiff

vs

**Civil Summons**

**3M COMPANY,**
Defendants

---

This Summons is directed to (name of Defendant):

3M COMPANY c/o Corporation Service Company, 2345 Rice Street, Suite 230, Roseville, MN 55113-5606.

1.  **You are being sued**. The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.  **You must BOTH reply, in writing, AND get a copy of your reply to the person/business who is suing you within 21 days to protect your rights.** Your reply is called an *Answer*. Getting your reply to the Plaintiff is called <u>service</u>. You must serve a copy of your *Answer or Answer and Counterclaim* (Answer) within 21 days from the date you received the *Summons* and *Complaint*.

    ANSWER: You can find the *Answer* form and instructions on the MN Judicial Branch website at www.mncourts.gov/forms under the "Civil" category. The instructions will explain in detail how to fill out the *Answer* form.

3.  **You must respond to each claim.** The *Answer* is your written response to the Plaintiff's *Complaint*. In your *Answer* you must state whether you agree or disagree with each paragraph of the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say that in your *Answer*.

4.      SERVICE: **You may lose your case if you do not send a written response to the Plaintiff.** If you do not serve a written *Answer* within 21 days, you may lose this case by default. You will not get to tell your side of the story. If you choose not to respond, the Plaintiff may be awarded everything they asked for in their *Complaint*. If you agree with the claims stated in the *Complaint*, you don't need to respond. A default judgment can than be entered against you for what the Plaintiff asked for in the *Complaint*.

        To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at this address:

Jason B. Epps, Partner, The Gori Law Firm, 156 N. Main Street, Edwardsville, Illinois  62025.


5.      Carefully read the Instructions (CIV301) for the *Answer* for your next steps.

6.      **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help:

- Visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county.

- Court Administration may have information about places where you can get legal assistance.

**NOTE: Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case.**


7.      **Alternative Dispute Resolution (ADR).** The parties may agree to or be ordered to participate in an ADR process under Rule 114 of the Minnesota Rules of Practice. You must still serve your written *Answer*, even if you expect to use ADR.


October 7, 2022                 s/Jason B. Epps
Date                            Jason B. Epps, MN Bar #0395925
                                Partner
                                The Gori Law Firm
                                156 N. Main Street
                                Edwardsville, IL  62025
                                Phone:  618-659-9833
                                Email:  Jason@gorilaw.com

| STATE OF MINNESOTA | DISTRICT COURT |
|---|---|
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | Product Liability / Personal Injury |
|---|---|
| MATTHEW FRANCO, | |
| Plaintiff, | **COMPLAINT** |
| v. | |
| 3M COMPANY, | |
| Defendant. | |

Plaintiff, by and through the undersigned counsel, submit this Complaint and Jury Trial Demand seeking judgment against Defendant 3M Company ("Defendant") for personal injuries and sequelae thereto sustained from Defendant's unreasonably dangerous product, the dual-ended Combat Arms™ earplug ("CAEv2").

## INTRODUCTION

1.      Plaintiff submits this Complaint to recover damages arising from hearing-related injuries and sequelae thereto caused by Defendant's CAEv2 which Defendant marketed and sold throughout the United States and abroad.

2.      Plaintiff used the dangerously defective CAEv2 during Plaintiff's military service, which included, among other things, firearms training, vehicle use and maintenance, non-combat related work in noise-hazardous conditions, and/or active military duty domestically and/or abroad.

3.     Defendant was aware of the defects and risks of the CAEv2 but nonetheless supplied this dangerously defective product to Plaintiffs and the United States military for more than a decade without Plaintiffs or the United States military having any knowledge of those defects and risks.

4.     The defective design of the CAEv2 prevented Plaintiffs from obtaining a proper fit and seal when inserting the device into their ear canals.

5.     The defective design of the CAEv2 also caused the device to loosen imperceptibly in Plaintiffs' ear canals.

6.     As a result of the dangerously defective design of the CAEv2, the device did not remain sealed to Plaintiffs' ear canals and thus allowed damaging sounds to enter Plaintiffs' ear canals, unbeknownst to Plaintiffs and the United States military.

7.     Defendant failed to warn or instruct Plaintiffs or the United States military of the defects and risks related to the CAEv2.

8.     Use of Defendant's CAEv2 has caused Plaintiffs to suffer hearing damage, tinnitus, and/or additional hearing-related injuries.

9.     Defendant's CAEv2 has caused thousands upon thousands, if not millions, of innocent civilians and military personnel to suffer hearing damage, tinnitus, and/or additional hearing-related injuries, including but not limited to pain, suffering, and loss of fundamental life pleasures.

2

## PARTIES

10.     Plaintiff MATTHEW FRANCO is an individual residing in the city of West Haven in the state of Connecticut.

11.     Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business in Minnesota. Defendant 3M is a citizen of Delaware and Minnesota for diversity of citizenship purposes. Defendant 3M has a dominant market share in virtually every safety product market, including hearing protection devices. Defendant 3M is one of the largest companies in the United States.

12.     On or about November 15, 2007, 3M acquired Aearo Technologies LLC for approximately $1.2 billion.

13.     Aearo Technologies LLC originally designed and sold the CAEv2 from 1999 to 2008.

14.     Defendant 3M is liable for their conduct by operation of law by which Defendant 3M expressly and/or implicitly assumed such liabilities upon acquisition of Aearo Technologies LLC.

15.     Knowledge of all facts detailed here memorialized in internal documents, test results, laboratory notebooks, emails, letter and other documentation reviewed by Defendant as part of its acquisition of Aearo Technologies LLC and retained by 3M in its standard course of business are imputed upon Defendant.

3

16.    Defendant, through its employees, became aware of and then continued to perpetuate a fraud upon the United States of America, Department of Defense, Service Members of our Armed Services and/or Plaintiff from 2008 until Plaintiff learned of the defective nature of the CAEv2 and Defendant's conduct.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over Plaintiff's claims under Minn. Stat. § 484.01, subd. 1.

18.    This action is not removable to federal court because Plaintiff asserts no claim arising under the Constitution, law, or treaties of the United States to satisfy 28 U.S.C. § 1331 and because even though the requirements of 28 U.S.C. § 1332(a) may be met, Plaintiff brings this suit in Defendant's home state and therefore 28 U.S.C. § 1441(b)(2) precludes removal.

19.    Venue is proper in Hennepin County, Minnesota under Minn. Stat. §§ 542.01nd 542.09 because 3M resides in Hennepin County in that it has its resident agent, an office, and a place of business in Hennepin County.

## FACTUAL ALLEGATIONS

### *Plaintiff's Use of 3M Combat Arms™ Earplugs Version 2*

20.    Plaintiff MATTHEW FRANCO served in the United States Armed Forces from approximately 2010 to approximately 2019.

4

21.     Plaintiff used 3M's dual-ended earplugs during service in the United States Armed Forces.

22.     While serving, Plaintiff was exposed to damaging, loud impulse, high-pitched sounds. Plaintiff suffered noticed hearing damage and tinnitus while serving in the United States Armed Forces.

23.     Plaintiff did not receive instructions to fold back the third flange on the opposite side of the use end of the Combat Arms™ earplug.

24.     Plaintiff suffers from hearing damage including hearing damage, difficulty with hearing in noise, and/or tinnitus.

*Defendant's CAEv2*

25.     The CAEv2 is a one-sized, dual-ended, triple-flanged earplug that Defendant promoted, advertised, marketed, distributed, and/or sold to civilians and the United States military.

26.     The olive-colored end of the CAEv2, referred to as the "closed," "blocked," or "linear" end, was marketed to provide the benefit of blocking as much sound as possible.

27.     Unlike the olive-colored end, the yellow-colored end of the CAEv2, referred to as the "open," "unblocked," or "non-linear" end, is attached to a non-linear filter, which was marketed as providing level-dependent hearing protection so

5

that users can hear low-level sounds (*e.g.*, close-range conversation), while also blocking loud impulse sounds (*e.g.*, noises from industrial machines).

28.     Drs. Pascal Hamery and Armand Dancer from the French-German Institute of Saint Louis ("ISL") designed and patented the non-linear filter in 2000.

29.     Dr. Hamery of ISL also designed and patented the "double-ended" design of the CAEv2 in 2000.

30.     According to U.S. Patent No. 6,070,693, ISL's "double-ended" earplug "can function either in a selective attenuation mode or a maximum attenuation mode," allowing users to "choose between two operating modes of attenuation."

31.     ISL's patent of the "double-ended" design makes clear that "[t]he hearing protector is intended to be sealingly inserted into the auditory canal of the user."

32.     Thus, in addition to designing, developing, and patenting the non-linear filter used in the CAEv2, Dr. Hamery also designed and patented the "double-ended" design of the CAEv2.

33.     Defendant subsequently acquired the rights to both patents arising from its purchase of Aearo Technologies LLC which had acquired such rights from ISL and/or obtained an exclusive license from ISL to use both patents in the CAEv2.

34.    On October 7, 2015, Jeff Hamer of 3M testified that Defendant's CAEv2 uses the "same basic notion of taking a plug, like the Ultrafit plug, forming it with a channel in it, and then putting [the ISL] filter in it."

35.    Likewise, on April 24, 2013, Doug Ohlin of 3M testified that "all [Defendant] had to do was insert the [ISL] filter" into Defendant's preexisting design of the triple-flanged Ultrafit earplug because "the hole was already there."

36.    The Ultrafit earplug already contained a small hole in its channel for a "music filter."

37.    Thus, in the words of Defendant's own internal documents, "3M is the creator" of the CAEv2.

### Civilian and Military Use

38.    Given the preexisting design of the CAEv2, which supposedly offered a "low tech" solution for protecting users from harmful noises, the United States military assigned the CAEv2 a national stock number and began purchasing the device in approximately 1999, after the product had already entered the commercial market.

39.    The CAEv2 was supplied to military personnel and civilians, including Plaintiffs, from at least 1999 to 2015, regardless of wartime, combat, and/or military-related exigencies.

7

40.     Bryan McGinley, who testified as 3M's corporate representative on April 3, 2013, asserted that "we don't differentiate between [private sector companies and governmental entities] with any of our products."

41.     Likewise, Elliott Berger, the Division Scientist of 3M's Personal Safety Division, testified on October 8, 2015, that the CAEv2 is "sold in markets other than just the military."

42.     Defendant supplied their commercial distributors with "blister pack version[s] of the dual-ended CAE," specifically "packed for retail stores."

43.     The part number and/or SKU of the device was 370-1011.

44.     Mr. Berger of 3M touted the CAEv2 to civilians as "ideal for outdoor shooting and hunting" because the device provided "good protection" for "thousands of rounds fired at indoor reverberant ranges."

45.     Civilians and military personnel, including Plaintiffs, relied on Defendant's representations that the CAEv2 is safe, effective, and provides two different options for adequate hearing attenuation and/or protection depending upon which end of the device is inserted into the user's ear.

46.     In addition to selling the CAEv2 to civilians and the United States military, Defendant marketed, distributed, and sold the CAEv2 commercially under different product names.

47.   For instance, among other products, Defendant's ARC earplug is structurally and technologically identical to the CAEv2.



48.   On October 21, 2015, Doug Moses of 3M acknowledged that there is no material "difference between Combat Arms and an ARC plug in terms of structure."

49.   In other words, as another 3M executive put it, "[t]he arc plug and dual end combat arms plug are the same except for the colors used."

50.   Defendant initially marketed and sold the ARC earplug to civilians, such as electrical linemen, who frequently encountered potential noise hazards from electric arcs.

51.   Defendant then targeted the ARC earplug to a broader commercial market, ranging from "utilities business[es]" to "the food processing industry."

52.   Given this identical commercial product, the CAEv2 was not designed or developed for exclusive military use.

*Defendant's Testing of the CAEv2*

9

53.     Federal and industry regulations required Defendant to test the safety and efficacy of the CAEv2 before distributing, supplying, and/or selling the device to consumers.

54.     Environmental Protection Agency ("EPA") regulations codified in 30 CFR 211.201 et seq., and the Noise Control Act, 42 U.S.C. § 4901 et seq., specifically regulate labeling and testing of hearing protection devices.

55.     Hearing protection devices are classified by their potential to reduce noise in decibels ("dB"), a term used to categorize the power or density of sound.

56.     Hearing protection devices must be tested pursuant to guidelines and procedures promulgated by the American National Standards Institute ("ANSI").

57.     These guidelines require manufacturers of hearing protection devices to test for and label their devices with a Noise Reduction Rating ("NRR").

58.     An NRR is a unit of measurement used to determine the effectiveness of hearing protection devices in decreasing sound exposure in certain environments.

59.     The noise measurement procedure published by ANSI, also known as ANSI S3.19-1974, governs the NRR labeling and testing of hearing protection devices.

60.     The higher the NRR number associated with a hearing protection device, the greater the potential for noise reduction in certain environments.

61.    The EPA requires manufacturers of hearing protection devices to provide accurate NRRs on the labels of their devices.

*Systemic Testing Bias*

62.    The EARCAL laboratory is located in Indianapolis, Indiana.

63.    Mr. Berger has managed the EARCAL laboratory since at least 1999.

64.    Mr. Berger testified at his October 8, 2015 deposition that instead of using randomized panels of test subjects, subjects were "preselect[] people to test out particular types of products," which ultimately "increase[s] the NRRs" of Defendant's hearing protection devices.

65.    EARCAL lab technician Ronald Kieper likewise testified at his October 9, 2015 deposition that he only use panels of individuals who are "able to consistently obtain [the] best fit on [a] particular type of hearing protector" and that limiting panels to such subjects in turn "raise[s] the NRR" of Defendant's hearing protection devices, including the CAEv2.

66.    The EARCAL laboratory began testing the CAEv2 in approximately December 1999 or January 2000.

67.    The first test of the CAEv2 identified as "Test 213015," involved the closed, blocked, or linear end of the device.

68.    The next test of the CAEv2 designated as "Test 213016," involved the open, unblocked, or non-linear end of the device.

69.     The intent of both of these tests to be NRR labeling tests.

70.     Mr. Berger admitted so at his October 8, 2015 deposition, averring that he believed Test 213015 was a "labeling test".

71.     Similarly, on October 9, 2015, Mr. Kieper testified at his deposition that "both of those [tests] were supposed to be labeling tests."

72.     Test 213015 and Test 213016 as labeling tests should not have terminated the tests prior to completion.

73.     Nor could the CAEv2 be properly sold based on incomplete labeling testing.

74.     After testing only eight of the ten subjects in Test 213015, Mr. Berger and Mr. Kieper terminated the test of the closed end of the CAEv2.

75.     Mr. Berger told Mr. Kieper to terminate the test of the closed end of the device because the average NRR of the eight subjects was only 10.9.

76.     Mr. Hamer of 3M also testified at his October 7, 2015 deposition that a 10.9 NRR provided "insufficient" protection for civilians and military personnel.

77.     Even an NRR of 17, explained Mr. Hamer, would be too low and thus not a "desirable NRR" for the closed end of the CAEv2.

78.     Defendant's internal documents likewise acknowledge that a 17 NRR provides "low attenuation" and insufficient protection from harmful noises.

79.    After the aborted test, Mr. Berger and Mr. Kieper determined that when users inserted the closed end of the CAEv2 into their ears, the edge of the third flange of the open end of the earplug pressed against the users' ears and folded backwards. When the inward pressure on the earplug released, the folded flange on the open end pushed back into its original shape and caused the earplug to loosen imperceptibly.

80.    In fact, Mr. Kieper testified that when he fitted each subject with the closed end of the CAEv2 according to standard instructions, "the flanges of the yellow [open] end would sometimes come into contact with their ear, and that would prevent [users from] getting the solid [closed] end in their ear deep enough to provide a seal."

81.    Mr. Kieper also emphasized that upon fitting the test subjects with the CAEv2, "[t]hey didn't realize it was coming out."

82.    Mr. Berger and Mr. Kieper therefore concluded that if used as designed and intended, the CAEv2 would loosen imperceptibly and provide "insufficient" hearing protection.

83.    Such imperceptible loosening would in turn allow harmful sounds to move around the totality of the earplug instead of through it, thus entering the user's ear canal and damaging the user's hearing.

13

84.     Given the symmetrical nature of the product with regard to its flanges, Mr. Berger and Mr. Kieper knew in 2000 that the design of the CAEv2 prevented a proper fit and seal when inserting either end of the device into the user's ear canal according to standard fitting procedures.

85.     Tellingly, when testing the open end of the CAEv2 in Test 213016, Mr. Berger and Mr. Kieper obtained an NRR of -2.

86.     An NRR of -2 indicated that the open end of the CAEv2 actually amplified sound rather than attenuated sound, as intended.

87.     Mr. Berger and Mr. Kieper knew "something went wrong" in Test 213016 given the negative NRR and "unusually high" standard deviations of the test results.

88.     Mr. Berger and Mr. Kieper also knew that NRR "[v]alues less than 0 make no sense."

89.     Unsurprisingly, then, Mr. Hamer testified that "the hearing protection device was perhaps not fitted correctly," and Mr. Kieper further testified that "the green flanges were causing the yellow end to come out of [the user's] ear."

90.     Without informing Plaintiffs or the United States military, Mr. Berger and Mr. Kieper brazenly and perniciously inflated the -2 NRR to a 0 NRR.

91.     Defendant has displayed the 0 NRR on the packaging of the CAEv2 ever since they began supplying the device to civilians and military personnel.

14

92.     Defendant has also continued to display the fabricated 0 NRR despite subsequent in-house and independent testing that generated significantly different NRRs for the open end of the device.

93.     Worse, Defendant touted the obviously invalid 0 NRR as a benefit of the open end of the device, routinely representing that soldiers and civilians would be able to hear quiet, close-range conversation despite being protected from louder, harmful noises.

94.     In reality, however, Defendant knew that, all the way back in 2000, the CAEv2's dangerously defective design, which not only prevents users from obtaining a proper fit and seal, caused the device to loosen imperceptibly regardless of which end of the device is inserted into the user's ear.

95.     Ultimately, both ends of the CAEv2 allow high-level and harmful sounds to move around the unsealed earplug and to enter the user's ear, causing hearing damage, tinnitus, and/or other hearing-related injuries.

*February 2000 Testing*

96.     Mr. Berger and Mr. Kieper retested the closed end of the device beginning in February 2000.

97.     Mr. Berger and Mr. Kieper identified this test as "Test 213017" and used a different panel of subjects than they used in Test 213015.

98.    Mr. Berger and Mr. Kieper also used different insertion instructions than in Test 213015, contrary to the standard instructions that would be provided to civilians and military personnel.

99.    Mr. Berger and Mr. Kieper conducted this retesting despite the fact that EARCAL laboratory policies and procedures did not allow retesting a hearing protection device by reconfiguring the device.

100.    In Test 213017, Mr. Berger and Mr. Kieper folded back the yellow flanges of the open end of the earplug prior to inserting the closed end into each subject's ear.

101.    This reconfigured fitting procedure ostensibly created a tighter fit and seal than the standard fitting procedure that Mr. Berger and Mr. Kieper had used in Test 213015.

102.    As a result of Test 213017, Mr. Berger and Mr. Kieper learned in 2000 that when the flanges of the open end of the CAEv2 were folded back prior to inserting the closed end of the earplug into the user's ear, the flanges of the open end neither touched the user's outer ear nor disturbed the seal of the earplug.

103.    Using this reconfigured insertion procedure, Mr. Berger and Mr. Kieper obtained an NRR of 21, almost twice the NRR of 10.9 generated in Test 213015.

104.    Still unsatisfied, Mr. Berger and Mr. Kieper excluded the data of one subject outright and threw data away as to at least 4 subjects wherein their initial test resulted which were problematic as notated by Mr. Kieper were not included in the recorded test results.  Moreover, one subject was also retested in May 2000, further manipulating the results of Test 213017.

105.    Based on the additional retest of that subject and the modified fitting procedures used in Test 213017, Mr. Berger and Mr. Kieper increased the NRR to 22 on the closed end of the CAEv2, more than doubling the NRR compared to Test 213015, which used Defendant's standard fitting procedures.

106.    3M's own testimony to date on the subject of how many subjects or CAEv2 plugs had the tips/ends rolled back. Though the Flange Report and contemporaneous communications reflect that "flanges" were rolled back, 3M appears to randomly suggest in testimony that possibly only one subject had rolled back flanges.

107.    However, rolling back one or all flanges does not address another central defect that 3M knew was a problem when it designed, sold and distributed the plug to the U.S. Military, namely: that the hard, stiff, fat adapter stem component would be incompatible with the human ear canal which is narrow in width and has tortuous turns and bends.  This lack of compatibility is directly contrary to the EPA 1979 Labeling guidelines by which all manufacturers were

17

directed to account for biocompatibility issues by making a plug that is flexible, something 3M diverged from, reflecting poor engineering and design decisions, decisions that have "come home to roost".

108.    Ironically, 3M's own Ron Kieper documented problems with the fit, seal and continued seal of the plug during the lab test in at least 4 of the 10 subjects of this "re-test". The documented problems included subjects with plugs loosening. It would follow that the ANSI 3.19 REAT test results would reflect variability and/or poor attenuation in at least one or more of the three attenuation at threshold runs across those four subjects. However, the 017 Test results are pristine resulting in the only logical conclusion that 3M threw data away and rigged the test.

109.    Defendant has displayed this manipulated 22 NRR on the packaging of the CAEv2 ever since.

110.    Defendant, however, never warned civilians, military personnel, or the United States military that they obtained the 22 NRR by testing the CAEv2 on an unrepresentative panel of subjects, that they manipulated the test data of those unrepresentative subjects, or that they reconfigured the device by folding back the flanges of the open end before inserting the closed end of the device into the ear canals of the test subjects.

111.    Mr. Hamer testified at his October 7, 2015 deposition that Defendant's testing of the CAEv2 "with the flange rolled back [was] improper."

18

112.    He also unequivocally admitted that "the labeling test that 3M's using for Combat Arms Version 2 for the green end is not the appropriate test."

113.    In stark contrast to folding back the opposing flanges of the CAEv2 when retesting the closed end of the device, Defendant did not retest the open end based on that reconfigured fitting procedure.

114.    Ultimately, given intentional manipulation and misrepresentation of the NRRs for both ends of the CAEv2, new employees who evaluated the internal testing of the device called the 22 NRR for the closed end and the 0 NRR for the open end an utter "mystery."

### *Defendant's False Claims About the CAEv2*

115.    Following Defendant's deceptive and unlawful testing of the CAEv2, Defendant and/or their distributors sold the device commercially and then to the United States military.

116.    Defendant and/or their distributors continued to sell the CAEv2 to civilians and the United States military until at least November 2015, when Defendant discontinued the CAEv2.

117.    Defendant therefore sold the CAEv2 commercially and to the military, reaping millions of dollars in ill-gotten profits from selling this defective product each year it was on the market.

*Inaccurate Noise Reduction Ratings*

19

118.   The NRRs of both the open end and closed end of the CAEv2 were inaccurately represented.

119.   Specifically, Defendant falsely marketed, advertised, and promoted the closed end of the CAEv2 to civilians and the United States military as a linear earplug with a 22 NRR.

120.   Internal testing revealed that the NRR of the closed end of the CAEv2 is only 10.9 when used according to the standard instructions for "proper use" that came with the device.

121.   Defendant also falsely marketed, advertised, and promoted the open end of the CAEv2 to civilians and the United States military as providing adequate level-dependent hearing protection with a 0 NRR.

122.   However, Defendant knew that initial test revealed that the NRR of the open end of the CAEv2 was -2, while later tests generated NRRs ranging from -1 to 6, leaving Defendant entirely "unsure" about the true NRR for the open end of the device.

123.   Defendant thus falsely represented that the CAEv2 provided civilians and military personnel with two different hearing protection options for providing adequate hearing protection regardless of which end of the plug is used.

124.   This was one alleged benefit that Plaintiffs and the United States military relied on in purchasing and/or using the CAEv2.

*Inadequate Instructions and Warnings*

125.    Defendant also directly and/or indirectly supplied, sold, and/or distributed the CAEv2 to civilians and military personnel without disclosing or warning about the defective design of the product.

126.    Defendant was aware of the dangerously defective design of the CAEv2 and that the device inadequately protected the hearing of civilian and military users such as Plaintiffs.

127.    Specifically, Defendant knew the CAEv2 could loosen in the user's ear—imperceptible to not only the user but also audiologists visually observing the user—thereby permitting damaging sounds to enter the user's ear through leaks in the seal between the user's ear and the earplug.

128.    Yet, Defendant did not adequately warn of the dangerous design defects of the CAEv2, despite their knowledge of the same.

129.    Defendant also did not adequately warn or instruct users, including Plaintiffs, how to wear and insert the CAEv2 in order to achieve the NRR ratings that Defendant advertised and promoted over the years.

130.    Although Defendant issued standard instructions for "proper use" of the CAEv2, the instructions did not instruct all users to fold back the opposing flanges of the earplug before inserting the device into their ears.

131.   Defendant's standard instructions also did not warn users that the unrepresentative panel of ten subjects who tested the CAEv2 in Test 213017 did not follow standard instructions for "proper use," but rather folded back the flanges of the opposite end of the earplug before inserting it into their ears.

132.   Nor did Defendant's standard instructions for "proper use" inform users that the CAEv2 would not provide a 22 NRR if they did not fold back the opposing flanges on the open end of the device before inserting the closed end of the device into their ears.

133.   Instead, Defendant's standard instructions simply directed users, such as Plaintiffs, to insert the CAEv2 into their ears.

134.   The instructions specifically stated: "INSERT the end you have selected into earcanal WHILE PULLING ear outward & upward with opposite hand. ADJUST until earplug feels securely seated in the earcanal."

135.   Thus, neither Plaintiffs nor the United States military knew that users had to fold back the opposing flanges of the earplug in order to obtain a proper seal.

136.   In fact, when asked whether he had "any documents showing that [he] told the Army that the instruction for the Combat Arms Version 2 should instruct [users] to roll back the flange," as in Test 213017, Mr. Berger of 3M testified "No."

137.   Julie Bushman, who previously served as 3M's Senior Vice President of Business Transformation and Information Technology, similarly stated at her

22

October 20, 2015 deposition that "[t]here's nothing in [the] instructions for use that mentions rolling back the flange."

138.    Unlike Defendant's "single-sided" earplug, which is "[s]old in pillow packs w/instructions," Defendant's internal documents confirm that the "Dual-Ended" version at issue here is "[s]old in [b]ulk [p]ack (no individual instructions)."

139.    Defendant knew that by failing to instruct Plaintiffs to fold back the flanges of the open end of the CAEv2 before inserting the closed end, the earplug would not seal to Plaintiffs' ears, thereby allowing harmful noise to enter Plaintiffs' ears unimpeded by the closed end of the earplug.

140.    Defendant also knew that by failing to instruct Plaintiffs to fold back the flanges of the closed end of the CAEv2 before inserting the open end, the earplug would not seal to Plaintiffs' ears, thus allowing harmful noise to enter Plaintiffs' ears unimpeded by the open end of the earplug.

141.    And by failing to instruct Plaintiffs to fold back the opposing flanges before inserting the closed end of the CAEv2 into their ear, Defendant falsely overstated the amount of hearing protection supposedly provided by the closed end of the CAEv2.

142.    Mr. Berger confirmed at his deposition that the 22 NRR only applied to the closed end of the CAEv2 if the user folded back the opposing flanges of the open end before inserting the closed end into the ear.

143.    When Defendant did not instruct users to fold back the flanges of the open end, Test 213015 revealed a 10.9 NRR for the closed end—less than half of the 22 NRR advertised on the label of the CAEv2.

144.    Mr. Berger also testified that Defendant "couldn't sell those plugs under the way they were being manufactured and fitted" because he and Mr. Kieper had terminated Test 213015, which Defendant had "intended to be a labeling test."

145.    In addition, by fabricating a 0 NRR for the open end of the CAEv2 in the face of contradictory NRR data, Defendant intentionally misstated the amount of protection provided by that end of the device.

146.    Although the open end of the CAEv2 provides little to no protection when used according to standard fitting procedures, Defendant represented to Plaintiffs and the United States military that the open mode "allow[s] situational awareness yet protect[s] against dangerous peak levels with a filter element that reacts instantaneously to provide increased protection."

147.    Defendant's labeling, packaging, and marketing of the CAEv2 are thus misleading and have caused thousands upon thousands—if not millions—of innocent users to suffer hearing damage and tinnitus.

148.    Given Defendant's improper and duplicitous testing, labeling, and marketing of the CAEv2, all known by Defendant prior to 1999, Mr. Berger of 3M declared at his October 8, 2015 deposition that "the instructions will be changed."

24

149.    Defendant discontinued the CAEv2 on or about November 17, 2015,
just a few weeks after Mr. Berger promised to change the instructions.

*Scientific Misrepresentations*

150.    In addition to sheltering the defects of the CAEv2, misrepresenting
the NRR for both ends of the earplug, and failing to warn or provide proper
instructions for using the earplug in civilian and military contexts, Defendant
distorted scientific sources when marketing, advertising, and promoting the CAEv2
to Plaintiffs and the United States military.

151.    Citing the 1998 Blast Overpressure Study by Daniel Johnson, for
example, Defendant's marketing brochures declared that "[t]he level-dependent
technology used in the [CAEv2] has been tested on human subjects and found to
be protective at 190 dBP for at least 100 exposures (sufficient to cover the loudest
weapons in the military inventory, including shoulder-fired rockets)."

152.    Given Defendant's gloss on the Johnson study, customers believed
that the CAEv2 was "protective at 190 dBP for at least 100 exposures" of the
"loudest weapons in the military inventory."

153.    Although Defendant repeatedly cited the Johnson study from 1999 to
2015 when marketing, advertising, and promoting the CAEv2, the Johnson study
does not actually show that the CAEv2 is "protective at 190 dBP for at least 100
exposures."

154.    To the contrary, according to a Technical Service Specialist at 3M, the CAEv2 does "not reduce 190 dB explosions to a safe level."

155.    In a July 9, 2014 email, Ted Madison of 3M informed Mr. Berger and other 3M employees that the Johnson "study only looked at whether the soldiers experienced temporary threshold shifts (TTSs) after a few blasts. There is more and more evidence that damage to the ears can occur even when TTS does not occur."

156.    Mr. Berger echoed Mr. Madison's criticism in the same email chain, stating that the study "found for a limited number of blasts up to about 190 dB the plugs prevented temporary threshold shifts." However, "those were large weapons with much low[er] frequency content. For rifle shots that are more hazardous to the ear because of their high-frequency content[,] the protection will not be as great."

157.    Mr. Berger also said the CAEv2 is "not the optimal choice for a gun range" and is "inadequate for indoor gun ranges," even though Defendant have advertised the CAEv2 for use in indoor and outdoor gun ranges ever since they started selling the product.

158.    On February 9, 2010, moreover, Mr. Berger declared that "I know on past sheets we have claimed [that the Johnson study] found the plug protective for impulse noise up to 193 dBP," but there were "no tests allowed at 193" and "NOT ENOUGH SUBJECTS were exposed to provide a definitive answer."

159.    Mr. Berger concluded: "I am unconvinced that [the study] can support the statement that says [the CAEv2] 'has been tested on human subjects and found to be protective at 190 dBP for at least 100 exposures.'"

160.    At best, Berger said, "it might be reasonable to claim 6 exposures."

161.    Even though Defendant knew the 1998 Johnson study did not support their claim that the CAEv2 was "protective at 190 dBP for at least 100 exposures," Defendant continued to knowingly market, advertise, and promote the product to the public based on that false statement.

162.    Defendant did so despite acknowledging in their public press releases that "[t]innitus, often referred to as 'ringing in the ears,' and noise-induced hearing damage can be caused by a one-time exposure to hazardous impulse noise, or by repeated exposure to excessive noise over an extended period of time."

*Fraudulent Concealment*

163.    At all times material hereto, Defendant committed a continuing fraud in obfuscating and failing to disclose facts that were known to them relating to their fraudulent testing of the CAEv2 and defective design of the product—facts that were not discovered and could not have been discovered by any person or Plaintiff undertaking reasonable due diligence.

164.     Plaintiffs did not and could not have discovered with reasonable diligence the veritable facts regarding Defendant's misrepresentations, omissions, faulty testing, and the defective design of the CAEv2.

165.     Nor could Plaintiffs have discovered that Defendant's CAEv2 caused their hearing-related injuries and/or sequelae thereto because the earplug caused imperceptible loosening, as Defendant knew all along.

166.     Defendant are jointly and severally liable to Plaintiffs for their individual and collective tortious acts.

### *Defendant's Discontinuation of the CAEv2*

167.     Defendant discontinued the CAEv2 on November 17, 2015.

168.     Although Defendant supplied the CAEv2 to innocent civilians and military personnel for more than a decade, their discontinuation of this defective device had been a long time in the making.

169.     Internal testing in January 2000 revealed that the CAEv2 was defectively designed and that the defective design caused the earplug to loosen imperceptibly in users' ears.

170.     Subsequent reports also made clear that "[a]lthough the Combat Arms Earplug (CAE) has been successful, there are a number of problems which need to be addressed which will result in changes and extensions to the line."

171.   Given the plethora of problems, Defendant changed the dual-ended design to a single-ended concept and created different sizing options in 2005.

172.   In 2013, however, Defendant acknowledged that the list of all potential improvements to the CAEv2 had "gone unanswered."

173.   In fact, more than 15 years after Defendant learned of the design defect of the CAEv2, Defendant finally discontinued this unreasonably dangerous product and "recommend[ed] that purchasers interested in [the product] consider 3M Combat Arms Earplugs – Generation 4 as an alternative."

174.   The Generation 4 Combat Arms Earplug, unlike the discontinued, dangerous, and defective CAEv2, provides linear and non-linear protection through a single-ended earplug rather than a dual-ended one.

175.   The single-ended Generation 4 Combat Arms Earplug thus does not suffer from the same dangerous defects as the CAEv2.

176.   The single-ended design of the Generation 4 Combat Arms Earplug is also easier for users to insert into their ear canal and obtain a proper fit and seal.

177.   Approximately one month before Defendant discontinued the CAEv2, Mr. Berger testified that the Generation 4 Combat Arms Earplug "did not suffer from having a second set of flanges that interfered with grasping the plug well and being able to insert it properly."

29

178.   He also said that the CAEv2 was "more difficult to fit because [users] don't have a stem or a rigid plastic part to hold onto."

179.   Because users do not have to "hold onto flanges, whether they're rolled back or not rolled back," Mr. Berger explained that the Generation 4 Combat Arms Earplug as well as other single-ended earplugs manufactured by Defendant, including the traditional Ultrafit earplug, had an ergonomically "better design."

180.   Indeed, none of Defendant's other pre-molded earplugs have rearward-facing flanges like the defective CAEv2.

181.   Mr. Berger summarized some of these design defects in an internal email to 3M personnel, declaring that the Generation 4 Combat Arms Earplug is not only "easier to insert correctly for a good seal and consistent performance," but it is also "easier to operate since it does not require removal and reinsertion to change from the open/weapon's fire mode to the closed/constant protection mode."

182.   What's more, unlike the "one-size-fits-all approach" of the CAEv2 that users "had to cram in" their ears, the Generation 4 Combat Arms Earplug comes in three different sizes—small, medium, and large.

183.   These different sizes allow users to obtain an effective seal, in contrast to the one-size-fits-all approach of the CAEv2.

184.    Defendant recognized in 2011—at least four years before they discontinued the CAEv2—that using a multiple-sized earplug "raise[s] comfort levels substantially" and allows for an "effective seal."

185.    Other documents reveal Defendant's decades-old knowledge that "[m]ore exact sizing not only ensures user comfort, but also a better fitting earplug that would not lose its seal or fall out of the ear."

186.    Because the Generation 4 Combat Arms Earplug avoids these and other issues, Defendant believe it is safer and more effective than the CAEv2.

187.    Indeed, when testing the Generation 4 Combat Arms Earplug in its closed position per standard fitting procedures, Defendant measured a 23 NRR.

188.    The 23 NRR of the Generation 4 Combat Arms Earplug is more than double the 10.9 NRR of the closed end of the CAEv2 when inserted according to Defendant's standard procedures for "proper use."

189.    The 23 NRR of the Generation 4 Combat Arms Earplug is also higher than the 22 NRR of the closed end of the CAEv2 when inserted according to Defendant's reconfigured fitting procedures.

190.    Defendant thus concluded that the Generation 4 Combat Arms Earplug attenuates impulse and continuous noise better than the CAEv2.

191.    Even Defendant's "standard Ultrafit" earplug outperforms the closed end of the CAEv2 when inserted according to Defendant's standard instructions or their reconfigured fitting procedure.

192.    In a confidential document dated December 12, 2010, Mr. Berger emphasized the "unexpectedly low values of mean attenuation" for the closed end of the CAEv2 compared to the "standard Ultrafit."

193.    Thus, the development of the Generation 4 Combat Arms Earplug brought Defendant "closer and closer (through CAE evolution) to the right solution," but they only reached that solution after perpetrating a protracted fraud on thousands and perhaps millions of innocent civilians and military personnel.

194.    To make matters worse, this dangerously defective product has not been recalled and thus continues to injure innocent civilians and military personnel.

### Defendant's Attempt to Block a Competitor from Entering the Market

195.    Besides fleecing civilians and the United States military into purchasing the dangerously defective CAEv2, Defendant also attempted to block competitors from entering the earplugs market.

196.    For example, one of Defendant's competitors is Moldex-Metric, Inc. ("Moldex")—a family-owned company located in Culver City, California.

197.   Among other safety devices, Moldex manufactures a single-sided, non-linear, dual-mode earplug called BattlePlugs, which Moldex introduced to the market in approximately 2011.

198.   At the time, Defendant held a virtual monopoly in the market for non-linear earplugs.

199.   In order to prevent Moldex from selling BattlePlugs and competing in the earplugs market, Defendant sued Moldex in the United States District Court for the District of Minnesota. *See 3M Co. v. Moldex-Metric, Inc.*, Case No. 12-611 (D. Minn.) ("*Moldex I*").

200.   The lawsuit accused Moldex of infringing U.S. Patent No. 6,070,693 ("'693 patent"), which Defendant had purchased and/or licensed from ISL and ultimately used to design and develop the CAEv2.

201.   Upon notice of the lawsuit, Moldex immediately informed Defendant that BattlePlugs did not infringe the '693 patent under any legal theory.

202.   Undeterred, Defendant stridently pursued their '693 patent claim against Moldex seeking injunctive relief in order to force Moldex out of the market.

203.   After Moldex moved for summary judgment on the '693 patent claim, however, Defendant sent Moldex a covenant not to sue on both the '693 patent and BattlePlugs in order to preclude the district court from adjudicating the motion.

204.    Defendant argued that the district court no longer had jurisdiction to hear their '693 patent claim or Moldex's dispositive motion of noninfringement.

205.    Defendant then moved to dismiss their infringement claims regarding the '693 patent with prejudice and to dismiss Moldex's counterclaims of noninfringement and invalidity of the '693 patent without prejudice.

206.    On June 19, 2013, the district court dismissed with prejudice Defendant's claims against Moldex relating to the '693 patent.

207.    The district court also dismissed without prejudice Moldex's claim for a declaration that BattlePlugs did not infringe the '693 patent.

208.    Although Defendant ultimately abandoned their lawsuit, Moldex was forced to incur significant legal and other expenses in defending against Defendant's baseless and malicious patent infringement claim.

209.    In June 2014, Moldex filed an antitrust sham litigation and malicious prosecution action against Defendant, alleging that Defendant's prosecution of the '693 patent claim in *Moldex I* was objectively baseless as no reasonable litigant could have expected to succeed on the merits. *See Moldex Metric, Inc. v. 3M Co.*, Case No. 14-1821 (D. Minn.) ("*Moldex II*").

210.    Moldex also alleged that Defendant filed the '693 patent claim in order to drive Moldex out of the earplugs market.

211.    The district court denied Defendant's motion to dismiss Moldex's malicious prosecution claim on the ground that Moldex had shown "clear and convincing evidence" in support of its malicious prosecution claim.

212.    The district court then granted Moldex's motion for summary judgment on the objective baselessness of Defendant's '693 patent claim, holding that "[n]o reasonable litigant could realistically expect success on the merits of 3M's claim that Moldex Metric infringed the '693 Patent."

213.    In addition to filing and prosecuting a baseless patent infringement lawsuit against Moldex, Defendant used other predatory and nefarious conduct in attempting to force this family-owned company out of the earplugs market.

214.    For instance, Defendant falsely maligned Moldex's BattlePlugs in order to persuade the United States military to purchase the CAEv2 through the JWOD (Javits-Wagner-O'Day) federal program.

215.    And shortly after 3M filed its frivolous '693 patent infringement claim against Moldex, 3M lodged a spurious protest against a solicitation that the United States military had awarded to Moldex.

### Defendant's Settlement with the United States Government

216.    On May 12, 2016, Moldex filed a sealed *qui tam* complaint against Defendant 3M under the False Claims Act, 31 U.S.C. § 3729 et seq. *See United States ex rel. Moldex-Metric, Inc. v. 3M Co.*, Case No. 3:16-cv-01533 (D.S.C.).

35

217.    Moldex alleged, on behalf of the United States, that Defendant 3M sold the CAEv2 to the "U.S. military for more than a decade without its knowledge of the defect."

218.    The United States intervened on July 25, 2018, in order to hold Defendant 3M liable for its fraudulent conduct.

219.    One day later, Defendant 3M agreed to pay $9.1 million to resolve the allegations that it knowingly sold the CAEv2 to the United States military without ever disclosing the design defects that hampered the effectiveness of this unreasonably dangerous hearing protection device.

220.    As one government official put it: "3M should have told the US Government about the slippage issues" with the CAEv2.

## CAUSES OF ACTION

### COUNT I
### DESIGN DEFECT - NEGLIGENCE

221.    Plaintiffs restate the allegations above as if fully rewritten herein.

222.    At all times relevant to this action, Defendant had a duty to design, manufacture, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the CAEv2 with reasonable and due care for the safety and well-being of users, including Plaintiffs and other civilians and military personnel who used the device.

223.    Plaintiffs were foreseeable users of the CAEv2.

224.    Defendant knew civilians and military personnel such as Plaintiffs would use the CAEv2.

225.    The CAEv2 is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

226.    When the CAEv2 is inserted into the ear according to standard fitting instructions, a proper seal is not formed with the ear.

227.    The defect has the same effect for both ends of the device because the earplug is symmetrical. In either scenario, the earplug may not maintain a tight fit and seal in some users like Plaintiffs, allowing dangerous sounds to bypass the earplug altogether and thus damage the user's hearing, unbeknownst to the user.

228.    Defendant failed to exercise reasonable and due care under the circumstances and therefore breached their duty of care in the following ways:

    a.    Defendant failed to design the CAEv2 in a manner that protected Plaintiffs from injury;

    b.    Defendant failed to design the CAEv2 in a manner that provided linear and non-linear protection;

    c.    Defendant failed to design the CAEv2 in a manner that provided the amount of linear and non-linear protection as represented;

d.   Defendant misrepresented the NRRs of the CAEv2 when used according to standard instructions;

e.   Defendant failed to test the CAEv2 properly and thoroughly;

f.   Defendant failed to analyze the testing data of the CAEv2 properly and thoroughly;

g.   Defendant claimed the CAEv2 had benefits that it does not in fact have;

h.   Defendant distributed, and sold the CAEv2 without adequately warning of the significant and dangerous risks of using the device;

i.   Defendant distributed, and sold the CAEv2 without providing adequate or proper instructions to avoid foreseeable harm;

j.   Defendant distributed, and sold the CAEv2 even though its risks and dangers outweighed any purported benefit of using the device;

k.   Defendant failed to fulfill the standard of care required of a reasonable and prudent manufacturer of hearing protection devices;

l.   Defendant continued to manufacture and distribute the CAEv2 to civilians and the United States military after they knew or

38

should have known of the device's adverse effects or the availability of safer designs;

m.   Defendant assumed the duty to warn of the defects and risks of the CAEv2 by providing instructions and information related to its benefits and effectiveness, but Defendant failed to provide adequate warnings and instructions; and

n.   Defendant provided inaccurate scientific and/or technical information when advertising, marketing, promoting, and supplying the CAEv2.

229.   Defendant knew or should have known that the defective condition of the CAEv2 made the device unreasonably dangerous.

230.   The CAEv2 was unreasonably dangerous when used by Plaintiffs, who followed the instructions provided by Defendant and used the earplug with common knowledge of its characteristics and according to its common usage.

231.   At the time the CAEv2 left Defendant's possession, the device was in a condition that made it unreasonably dangerous to Plaintiffs.

232.   At the time Plaintiffs used the CAEv2, the device was in a condition that made it unreasonably dangerous to Plaintiffs.

233.   The CAEv2 used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendant.

234.   At all relevant times, Plaintiffs used the CAEv2 in the manner in which the device was intended to be used.

235.   As designers, developers, manufacturers, inspectors, advertisers, distributors, and suppliers of the CAEv2, Defendant had superior knowledge of the product and owed a duty of care to Plaintiffs.

236.   It was foreseeable that Defendant's misrepresentations, actions, and omissions would cause severe, permanent, and debilitating injuries to Plaintiffs.

237.   Defendant's conduct was a substantial factor in bringing about the injuries and/or sequelae thereto sustained by Plaintiffs.

238.   As a direct and proximate result of Defendant's negligence, Plaintiffs suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

239.   As a direct and proximate result of Defendant's negligence, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

240.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT II**
**DESIGN DEFECT – STRICT LIABILITY**

241.    Plaintiffs restate the allegations above as if fully rewritten herein.

242.    Defendant marketed, distributed and sold the CAEv2.

243.    Plaintiffs were foreseeable users of the CAEv2.

244.    The CAEv2 is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

245.    The CAEv2 is also defective because it fails to contain adequate warnings of the significant risks of using the earplug, it fails to contain adequate or proper instructions for use, and the risks and dangers of using the device outweigh any purported benefit.

246.    Defendant knew that the defective condition of the CAEv2 made the device unreasonably dangerous to Plaintiffs.

247.    The CAEv2 is dangerous when used by ordinary users such as Plaintiffs, who used the device as it was intended to be used.

41

248.   The CAEv2 is dangerous to an extent beyond what would be contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear canal.

249.   At all relevant times, an economically and technologically feasible and safer alternative design existed for the CAEv2.

250.   At the time the CAEv2 left Defendant's possession, the CAEv2 was defective and in a condition that made the device unreasonably dangerous to Plaintiffs.

251.   At the time Plaintiffs used the CAEv2, the device was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

252.   The CAEv2 used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendant.

253.   At all relevant times, Plaintiffs used the CAEv2 in the manner in which the earplug was intended to be used.

254.   The CAEv2 was the proximate cause of Plaintiffs' hearing damage and/or tinnitus because the design of the earplug allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk.

255.   Defendant's conduct was a substantial factor in bringing about Plaintiffs' injuries and/or sequelae thereto.

42

256.   As a direct and proximate result of Defendant's defective design of the CAEv2, Plaintiffs' suffered serious and dangerous injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

257.   As a direct and proximate result of Defendant's defective design of the CAEv2, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

258.   Plaintiffs may also be required to obtain additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT III
## FAILURE TO WARN – NEGLIGENCE

259.   Plaintiffs restate the above allegations as if rewritten fully herein.

260.   At all times relevant to this action, Defendant had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the CAEv2 with reasonable and due care for the safety and well-being of Plaintiffs, who were subject to and used the product.

261.   Plaintiffs were foreseeable users of the product.

43

262. The CAEv2 is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes the earplug is working as intended.

263. Defendant breached their duty to Plaintiffs by failing to warn of the risks and dangers of using the CAEv2 as intended.

264. The CAEv2 did not warn or instruct that it allows harmful sounds to bypass the earplug, thereby posing a serious risk.

265. Defendant also breached their duty to Plaintiffs because they failed to warn or instruct that their testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

266. Defendant also breached their duty to Plaintiffs because they failed to warn or instruct that following Defendant's standard instructions for insertion would not achieve a 22 NRR and would thereby pose a serious risk to Plaintiffs.

267. Defendant further breached their duty to Plaintiffs because they failed to warn or instruct that they had not adequately or properly tested the CAEv2.

268. The warnings and instructions of the CAEv2 did not provide the amount of information that an ordinary consumer would expect when using the device in a reasonably foreseeable manner.

269.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the CAEv2, including but not limited to instructions directing them to fold back the opposing flanges of the device, Plaintiffs would have heeded such a warning or instruction.

270.    Defendant's failure to warn of the design defect or risks and dangers of the CAEv2 proximately caused Plaintiffs' injuries and/or sequelae thereto.

271.    As a direct and proximate result of Defendant's failure to warn, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

272.    As a direct and proximate result of Defendant's failure to warn, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

273.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT IV
## FAILURE TO WARN – STRICT LIABILITY

274.    Plaintiffs restate the allegations above as if fully rewritten herein.

275.    Defendant marketed, distributed and sold the CAEv2.

45

276.    Plaintiffs were foreseeable users of the CAEv2.

277.    The CAEv2 is defective because it loosens imperceptibly in the user's ear, thereby permitting damaging sounds to enter the user's ear canal by traveling around the outside of the earplug while the user incorrectly believes that the earplug is working as intended.

278.    The CAEv2 is defective and unreasonably dangerous even if Defendant exercised all proper care in the preparation and sale of the product.

279.    Defendant knew that the defective condition of the CAEv2 made the device unreasonably dangerous to users such as Plaintiffs.

280.    The CAEv2 is dangerous when used by an ordinary user who used the device as intended.

281.    The CAEv2 is dangerous to an extent beyond that contemplated by the ordinary user who purchased and/or used the device because it allows dangerous sounds to enter the user's ear.

282.    Defendant knew or should have known of the defective design of the CAEv2 at the time they provided the device to Plaintiffs.

283.    At the time the CAEv2 left Defendant's possession, the earplug was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

284.    At the time Plaintiffs used the CAEv2, the device was defective and in a condition that made it unreasonably dangerous to Plaintiffs.

46

285.   The CAEv2 used by Plaintiffs was expected to and did reach Plaintiffs without substantial change in the condition in which the device was manufactured, sold, distributed, and marketed by Defendant.

286.   At all relevant times, Plaintiffs used the CAEv2 in the manner in which the device was intended to be used.

287.   The CAEv2 is defective because Defendant failed to warn or instruct that the device allows dangerous sounds to bypass the earplug altogether, posing a serious risk to users.

288.   The CAEv2 is also defective because Defendant failed to warn or instruct that their testing subjects did not follow standard instructions, but rather used a reconfigured method of folding back the opposing flanges before inserting the device into their ears.

289.   The CAEv2 is also defective because Defendant failed to warn or instruct that following their standard instructions for insertion would not achieve a 22 NRR and would thus pose a serious risk to users.

290.   The CAEv2 is also defective because Defendant failed to warn or instruct—or inadequately warned and instructed—that the device had not been adequately or properly tested.

291.   The warnings and instructions that accompanied the CAEv2 failed to provide the level of information that an ordinary consumer, including Plaintiffs,

would expect when using the product in a manner reasonably foreseeable to Defendant.

292.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the CAEv2, including but not limited to instructions to fold back the opposing flanges, Plaintiffs would have heeded the warning and/or instruction.

293.    The CAEv2 proximately caused Plaintiffs' hearing damage and/or tinnitus because the device allows dangerous sounds to bypass the earplug altogether, thereby posing a serious risk to Plaintiffs.

294.    Defendant's conduct was a substantial factor in causing Plaintiffs' injuries and/or sequelae thereto.

295.    As a direct and proximate result of Defendant's failure to warn, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

296.    As a direct and proximate result of Defendant's failure to warn, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

297.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V
## BREACH OF EXPRESS WARRANTY

298.　Plaintiffs restate the allegations above as if fully rewritten herein.

299.　Through Defendant's public statements, descriptions, and promises relating to the CAEv2, Defendant expressly warranted that the product was safe and effective for its intended use and was designed to prevent harmful sounds from entering and thus damaging the user's hearing.

300.　These warranties came in one or more of the following forms:

　　　a.　publicly made written and verbal assurances of safety;

　　　b.　press releases, media dissemination, or uniform promotional information intended to create demand for the CAEv2, but which contained misrepresentations and failed to warn of the risks of using the product;

　　　c.　verbal assurances made by Defendant's consumer relations personnel about the safety of the CAEv2, which also downplayed the risks associated with the product; and

　　　d.　false, misleading, and inadequate written information and packaging supplied by Defendant.

49

301.    When Defendant made these express warranties, they knew the intended purposes of the CAEv2 and warranted the product to be in all respects safe and proper for such purposes.

302.    Defendant drafted the documents and/or made statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties.

303.    The CAEv2 does not conform to Defendant's promises, descriptions, or affirmations, and is not adequately packaged, labeled, promoted, and/or fit for the ordinary purposes for which it was intended.

304.    All of the aforementioned written materials are known to Defendant and in their possession, and it is Plaintiffs' belief that these materials shall be produced by Defendant and made part of the record once discovery is completed.

305.    As a direct and proximate result of Defendant's breach of these warranties, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

306.    As a direct and proximate result of Defendant's breach of the express warranties, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

307.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VI
## BREACH OF IMPLIED WARRANTIES

308.    Plaintiffs restate the allegations above as if fully rewritten herein.

309.    At all times material to this action, Defendant were merchants of the CAEv2.

310.    Plaintiffs were foreseeable users of the CAEv2.

311.    At the time Defendant marketed, sold, and distributed the CAEv2, Defendant knew of the intended use of the CAEv2, impliedly warranted the CAEv2 to be fit for a particular purpose, and warranted that the CAEv2 was of merchantable quality and effective for such use.

312.    Defendant knew or had reason to know that Plaintiffs would rely on Defendant's judgment and skill in providing the CAEv2 for its intended use.

313.    Plaintiffs reasonably relied upon the skill and judgment of Defendant as to whether the CAEv2 was of merchantable quality, safe, and effective for its intended use.

314.    Contrary to Defendant's implied warranties, the CAEv2 is neither of merchantable quality, nor safe or effective for its intended use, because the device

is unreasonably dangerous, defective, unfit, and ineffective for the ordinary purposes for which it is used.

315.    The CAEv2 was sold without adequate instructions or warnings regarding the foreseeable risk of harm posed by the device.

316.    Defendant breached their implied warranties to Plaintiffs because the CAEv2 was not adequately tested and was not of merchantable quality, safe, or fit for its foreseeable and reasonably intended use.

317.    Defendant's breach of their implied warranties violated numerous statutes, including but not limited to:

        a.      Ala. Code §§ 7-2-314 et seq.;

        b.      Alaska Stat. §§ 45.02.314 et seq.;

        c.      Ariz. Rev. Stat. Ann. §§ 47-2314 et seq.;

        d.      Ark. Code Ann. §§ 4-2-314 et seq.;

        e.      Cal. Com. Code §§ 2314 et seq.;

        f.      Colo. Rev. Stat. §§ 4-2-314 et seq.;

        g.      Conn. Gen. Stat. Ann. §§ 42a-2-314 et seq.;

        h.      Del. Code Ann. tit. 6, §§ 2-314 et seq.;

        i.      D.C. Code Ann. §§ 28:2-314 et seq.;

        j.      Fla. Stat. Ann. §§ 672.314 et seq.;

        k.      O.C.G.A. §§ 11-2-314 et seq.;

l.      Haw. Rev. Stat. §§ 490:2-314 et seq.;

m.      Id. Code §§ 28-2-314 et seq.;

n.      Ill. Comp. Stat. Ann. Ch. 810, 5/2-314 et seq.;

o.      Indiana Code Ann. §§ 26-1-2-314 et seq.;

p.      Iowa Code Ann. §§ 554.2314 et seq.;

q.      Kan. Stat. Ann. §§ 84-2-314 et seq.;

r.      Ky. Rev. Stat. Ann. §§ 355.2-314 et seq.;

s.      La. Civ. Code Ann. art. 2520 et seq.;

t.      Me. Rev. Stat. Ann. tit. 11, §§ 2-314 et seq.;

u.      Md. Code Ann., Com. Law §§ 2-314 et seq.;

v.      Mass. Gen. Laws Ann. Ch. 106, §§ 2-314 et seq.;

w.      Mich. Comp. Laws Ann. §§ 440.2314 et seq.;

x.      Minn. Stat. Ann. §§ 336.2-314 et seq.;

y.      Miss. Code Ann. §§ 75-2-314 et seq.;

z.      Mo. Rev. Stat. §§ 400.2-314 et seq.;

aa.     Mont. Code Ann. §§ 30-2-314 et seq.;

bb.     Neb. Rev. Stat. §§ 2-314 et seq.;

cc.     Nev. Rev. Stat. §§ 104.2314 et seq.;

dd.     N.H. Rev. Stat. Ann. §§ 382-A:2-314 et seq.;

ee.     N.J. Stat. Ann. §§ 12A:2-314 et seq.;

ff.    N.M. Stat. Ann. § 55-2-314 et seq.;

gg.    N.Y. U.C.C. Law §§ 2-314 et seq.;

hh.    N.C. Gen. Stat. Ann. §§ 25-2-314 et seq.;

ii.    N.D. Cent. Code §§ 41-02-31 et seq.;

jj.    Ohio Rev. Code Ann. §§ 1302.27 et seq.;

kk.    Okl. Stat. tit. 12A, §§ 2-314 et seq.;

ll.    Or. Rev. Stat. §§ 72.3140 et seq.;

mm.    13 Pa. Stat. Ann. §§ 2314 et seq.;

nn.    R.I. Gen. Laws §§ 6A-2-314 et seq.;

oo.    S.C. Code Ann. §§ 36-2-314 et seq.;

pp.    S.D. Codified Laws §§ 57A-2-314 et seq.;

qq.    Tenn. Code Ann. §§ 47-2-314 et seq.;

rr.    Tex. Bus. & Com. Code §§ 2.314 et seq.;

ss.    Utah Code Ann. §§ 70A-2-314 et seq.;

tt.    Va. Code Ann. §§ 8.2-314 et seq.;

uu.    Vt. Stat. Ann. tit. 9A, §§ 2-314 et seq.;

vv.    Wash. Rev. Code §§ 62A.2-314 et seq.;

ww.    W. Va. Code §§ 46-2-314 et seq.;

xx.    Wis. Stat. Ann. §§ 402.314 et seq.; and

yy.    Wyo. Stat. Ann. §§ 34.1-2-314 et seq.

318.   Plaintiffs could not have discovered that Defendant breached their warranties or the danger in using the CAEv2.

319.   As a direct and proximate result of Defendant's breach of implied warranties, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

320.   As a direct and proximate result of Defendant's breach of the implied warranties, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

321.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

### COUNT VII
### NEGLIGENT MISREPRESENTATION

322.   Plaintiffs restate the allegations above as if fully rewritten herein.

323.   Defendant had a duty to tell Plaintiffs and the public the truth of the efficacy, risks, and harms associated with the CAEv2.

324.   Defendant breached their duty by falsely representing to Plaintiffs and the public that the CAEv2 had been properly tested and found to be effective when Defendant knew or should have known that the device is defective, had not

55

been properly or adequately tested, and that Defendant had manipulated the test results.

325.    Defendant also breached their duty by falsely representing to Plaintiffs and the public that the instructions for use of the CAEv2 were proper and adequate and would result in the advertised NRR when Defendant knew or should have known these statements were false.

326.    Defendant were in fact aware that they unlawfully manipulated the testing of the CAEv2 and that their instructions were inadequate and improper.

327.    Defendant failed to exercise ordinary care in the representation of the CAEv2 during its manufacturing, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Defendant negligently misrepresented the safety and efficacy of the device.

328.    As a result of these misrepresentations and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

329.    As a direct and proximate result of these misrepresentations, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

330.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION

331.    Plaintiffs restate the allegations above as if fully rewritten herein.

332.    Defendant falsely and fraudulently represented to Plaintiffs and the public that the CAEv2 had been properly tested, was free from all defects, and contained adequate warnings and instructions.

333.    Defendant also falsely and fraudulently represented to Plaintiffs and the public that the CAEv2 functioned properly and promoted the closed end as having a 22 NRR and the open end having a 0 NRR.

334.    Defendant also manipulated testing of the CAEv2, resulting in false and misleading NRRs and improper fitting instructions.

335.    Defendant therefore knew that the CAEv2 could and would injure Plaintiffs.

336.    When Defendant made these representations, they knew their claims were false, and they willfully, wantonly, and recklessly disregarded the truth.

337.    Defendant made these false representations with the intent of defrauding Plaintiffs and the public, and with the intent of inducing Plaintiffs and the public to recommend, purchase, and/or use the CAEv2, all of which demonstrate

a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiffs.

338.    At the time Defendant made the foregoing representations, and at the time Plaintiffs used the CAEv2, Plaintiffs did not know of the falsity of the representations and reasonably believed them to be true.

339.    In reliance upon these representations, Plaintiffs were in fact induced to and did use the CAEv2, thereby sustaining injuries and/or sequelae thereto.

340.    As a result of the foregoing acts and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

341.    As a direct and proximate result of the foregoing acts and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

342.    Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT IX
## FRAUDULENT CONCEALMENT

343.    Plaintiffs restate the allegations above as if fully rewritten herein.

344.    At all times relevant, Defendant misrepresented the safety and efficacy of the CAEv2 for its intended use.

345.    Defendant knew or were reckless in not knowing that their representations were false.

346.    In their representations to Plaintiffs, Defendant fraudulently concealed and intentionally omitted the following material information:

    a.    the flawed and deliberately manipulated testing of the CAEv2;

    b.    the inadequate amount of hearing protection provided by the CAEv2;

    c.    the inadequacy of the standard instructions for proper use of the CAEv2;

    d.    the defective, improper, negligent, fraudulent, and dangerous design of the CAEv2; and

    e.    the dangerous effects of the CAEv2.

347.    Defendant had a duty to disclose the foregoing issues to Plaintiffs.

348.    Defendant had sole access to the material facts concerning the defective nature of the product and its propensity to cause dangerous injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

59

349.   Defendant's concealment of information regarding the safety and efficacy of the CAEv2 was willful, wanton, and/or reckless and was intended to mislead Plaintiffs into using the product.

350.   Defendant knew that Plaintiffs could not determine the truth of this information.

351.   Plaintiffs reasonably relied on facts revealed, which negligently, fraudulently, and/or purposefully did not include facts that Defendant concealed.

352.   As a direct and proximate result of the foregoing concealments and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

353.   As a direct and proximate result of the foregoing concealments and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

354.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT X
## FRAUD AND DECEIT

355.   Plaintiffs restate the allegations above as if fully rewritten herein.

356.    Defendant conducted unlawful and improper testing on the CAEv2.

357.    As a result of this unlawful and improper testing, Defendant blatantly and intentionally omitted certain test results and distributed false information that misrepresented the amount of hearing protection provided by the CAEv2.

358.    Defendant had a duty when disseminating information to disclose truthful information and a parallel duty not to deceive the public and Plaintiffs.

359.    The information that Defendant distributed to Plaintiffs contained false and misleading material representations and/or omissions concerning the safety and efficacy of the CAEv2.

360.    Upon information and belief, Defendant intentionally suppressed and/or manipulated test results to misrepresent the amount of hearing protection provided by the CAEv2.

361.    In making these misrepresentations, Defendant intended to deceive and defraud the public and Plaintiffs, to gain the confidence of the public and Plaintiffs, and to induce the public and Plaintiffs to purchase, request, dispense, recommend, and/or continue using the CAEv2.

362.    Defendant also made the foregoing false claims and false representations with the intent of convincing the public and Plaintiffs that the CAEv2 is effective and safe for use.

363.   These representations and the others alleged herein were false when made, and/or made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard for the truth.

364.   Defendant intended these false representations to deceive and defraud Plaintiffs, to induce Plaintiffs to rely upon them, and to cause Plaintiffs to purchase, use, and/or rely on the CAEv2.

365.   Defendant recklessly and intentionally misrepresented the efficacy and safety of the CAEv2 to the public and Plaintiffs for the specific purpose of influencing the marketing of a product that only Defendant knew was dangerous and defective or not as safe as other alternatives.

366.   Defendant willfully and intentionally failed to disclose material facts regarding the dangers and safety concerns of the CAEv2 by concealing and suppressing material facts regarding such information.

367.   Defendant willfully and intentionally failed to disclose material facts and made false representations in order to deceive and lull Plaintiffs into purchasing, using, and/or relying on the CAEv2.

368.   Plaintiffs did in fact rely on and believe Defendant's representations to be true at the time Defendant made the representations.

369.   Plaintiffs were thus induced to purchase, use, and/or rely on the CAEv2 based on Defendant's false representations.

370.    At the time Defendant made these representations, Plaintiffs did not know about any safety concerns regarding the CAEv2.

371.    Plaintiffs did not discover the true facts regarding Defendant's false representations; nor could Plaintiffs have done so with reasonable diligence.

372.    Had Plaintiffs known the true facts, they would not have purchased, used, and/or relied on the CAEv2.

373.    Defendant's conduct constitutes fraud and deceit and was committed and/or perpetrated willfully, wantonly, and/or purposefully on Plaintiffs.

374.    As a result of the foregoing acts and omissions, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

375.    As a direct and proximate result of the foregoing acts and omissions, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

376.    Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT XI**
**GROSS NEGLIGENCE**

377.   Plaintiffs restate the allegations above as if fully rewritten herein.

378.   Defendant's conduct in designing, testing, advertising, and supplying the dangerously defective CAEv2 was grossly negligent.

379.   Punitive damages are appropriate given Defendant's gross negligence, fraudulent conduct, and deliberate indifference to the rights, safety, and/or welfare of Plaintiffs.

380.   Plaintiffs relied on Defendant's grossly negligent representations and/or omissions and suffered serious injuries as a proximate result of such reliance.

381.   Plaintiffs therefore seek to assert claims for punitive damages in an amount within the jurisdictional limits of the Court, as set forth below.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XII
## NEGLIGENCE PER SE

382.   Plaintiffs restate the allegations above as if fully rewritten herein.

383.   At all times, Defendant had an obligation to comply with applicable statutes and regulations, including the Noise Control Act and implementing regulations, in the labeling and testing of the CAEv2.

384.   Defendant's actions as described herein violated applicable statutes and regulations, including but not limited to 42 U.S.C. § 4901 et seq., and 40 C.F.R.

§ 211.201 et seq., which regulate hearing protection devices such as the CAEv2, as well as NRR labeling and testing of such devices.

385.    Specifically, Defendant violated 42 U.S.C. § 4907 and 40 C.F.R. §§ 211.104, 211.210, and 211.211 by mislabeling the CAEv2, misrepresenting the NRR on the label of the device, and/or by failing to include proper fitting instructions to achieve the NRR stated on the label of the device.

386.    Defendant did not follow the "[m]ethods for measurement of sound attenuation" stated in 40 C.F.R. § 211.206 and as required by ANSI S3.19-1974.

387.    Defendant violated 40 C.F.R. § 211.207 by failing to properly calculate the NRR of the CAEv2.

388.    Plaintiffs are within the class of persons that these statutes and regulations are intended to protect.

389.    Plaintiffs' injuries and/or symptoms are the type of harm that these statutes and regulations are intended to prevent.

390.    Defendant's violations of the foregoing statutes and regulations, among others, constitutes negligence per se.

391.    As a direct and proximate result of Defendant's statutory and regulatory violations, Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

392.   As a direct and proximate result of Defendant's statutory and regulatory violations, Plaintiffs require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

393.   Plaintiffs may also require additional medical and/or hospital care, attention, and services in the future.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT XIII**
**CONSUMER FRAUD AND/OR UNFAIR AND**
**DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

394.   Plaintiffs restate the allegations above as if fully rewritten herein.

395.   Certain Plaintiffs herein will bring a cause of action for consumer fraud and/or unfair and deceptive trade practices under applicable state law.

396.   Defendant are on notice that such claims may be asserted by those Plaintiffs.

397.   Plaintiffs purchased and/or used the CAEv2 and suffered ascertainable losses as a result of Defendant's actions in violation of these consumer protection laws.

398.    Had Defendant not engaged in the deceptive conduct described herein, neither Plaintiffs nor the United States military would have purchased and/or paid for the CAEv2.

399.    Nor would Plaintiffs have incurred related medical costs and injuries from using the device.

400.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include the following:

        a.    representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

        b.    advertising goods or service with the intent not to sell them as advertised; and

        c.    engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

401.    Plaintiffs were injured by Defendant's unlawful conduct, which was intended to artificially create sales of the CAEv2.

402.    Defendant have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of devices such as the CAEv2.

403.    Defendant's deceptive, unconscionable, unfair, and/or fraudulent representations and material omissions to Plaintiffs and the United States military

constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including but not limited to:

a. Ala. Ala. Code §§ 8-19-1 et seq.;

b. Alaska Stat. §§ 45.50.471 et seq.;

c. Ariz. Rev. Stat. Ann. §§ 44-1522 et seq.;

d. Ark. Code Ann. §§ 4-88-101 et seq.;

e. Cal. Civ. Code §§ 1770 et seq.

f. Cal. Bus. & Prof. Code §§ 17200 et seq.;

g. Colo. Rev. Stat. §§ 6-1-105 et seq.;

h. Conn. Gen. Stat. §§ 42-110a et seq.;

i. Del. Code Ann. tit. 6, §§ 2511 et seq., §§ 2531 et seq.;

j. D.C. Code Ann. §§ 28-3901 et seq.;

k. Fla. Stat. Ann. §§ 501.201 et seq.;

l. O.C.G.A. §§ 10-1-372 et seq.;

m. Haw. Rev. Stat. §§ 481A-1 et seq.;

n. Id. Code Ann. §§ 48-601 et seq.;

o. Ill. Comp. Stat. Ann. ch. 815, 505-1 et seq.;

p. Ind. Code Ann. §§ 24-5-0.5-1 et seq.;

q. Iowa Code Ann. §§ 714.16 et seq.;

r. Kan. Stat. Ann. §§ 50-623, et seq.;

s.      Ky. Rev. Stat. Ann. §§ 367.110 et seq.;

t.      La. Rev. Stat. Ann. §§ 51:1401 et seq.;

u.      Me. Rev. Stat. Ann. tit. 5, §§ 205A et seq.;

v.      Md. Code Ann., Com. Law §§ 13-101 et seq.;

w.      Mass. Gen. Laws Ann. Ch. 93A et seq.;

x.      Mich. Comp. Laws §§ 445.901 et seq.;

y.      Minn. Stat. §§ 325D.43, et seq. §§ 325F.67 et seq., §§ 325F.69;

z.      Miss. Code Ann. §§ 75-24-3 et seq.;

aa.     Mo. Ann. Stat. §§ 407.010 et seq.;

bb.     Mont. Code Ann. §§ 30-14-101 et seq.;

cc.     Neb. Rev. Stat. §§ 59-1601 et seq.;

dd.     Nev. Rev. Stat. §§ 598.0903 et seq.;

ee.     N.H. Rev. Stat. Ann. §§ 358-A:1 et seq.;

ff.     N.J. Stat. Ann. §§ 56:8-2 et seq.;

gg.     N.M. Stat. Ann. §§ 57-12-1 et seq.;

hh.     N.Y. Gen. Bus. Law §§ 349 et seq., §§ 350-e et seq.;

ii.     N.C. Gen. Stat. §§ 75-1.1 et seq.;

jj.     N.D. Cent. Code §§ 51-12-01 et seq., §§ 51-15-01 et seq.;

kk.     Ohio Rev. Code Ann. §§ 1345.01 et seq.;

ll.     Okla. Stat. tit. 15 §§ 751 et seq.;

mm.   Or. Rev. Stat. §§ 646.605 et seq.;

nn.   73 Pa. Stat. §§ 201-1 et seq.;

oo.   R.I. Gen. Laws. §§ 6-13.1-1 et seq.;

pp.   S.C. Code Ann. §§ 39-5-10 et seq.;

qq.   S.D. Codified Laws §§ 37-24-1 et seq.;

rr.   Tenn. Code Ann. §§ 47-18-101 et seq.;

ss.   Tex. Bus. & Com. Code Ann. §§17.41 et seq.;

tt.   Utah Code Ann. §§ 13-11-1 et seq.;

uu.   Vt. Stat. Ann. tit. 9, §§ 2451 et seq.;

vv.   Va. Code Ann. §§ 59.1-196 et seq.;

ww.   Wash. Rev. Code. §§ 19.86.010 et seq.;

xx.   W. Va. Code §§ 46A-6-101 et seq.;

yy.   Wis. Stat. Ann. §§ 100.20 et seq.; and

zz.   Wyo. Stat. Ann. §§ 40-12-101 et seq.

404.   Under these and other consumer protection statutes, Defendant are the suppliers, manufacturers, advertisers, and sellers of the CAEv2, who are subject to liability under such legislation from fraudulent, unfair, deceptive, and unconscionable consumer sales practices.

405.   The actions and omissions of Defendant are uncured or incurable.

406.    Defendant were put on notice of these issues by the investigation of the United States, numerous complaints filed against them, and individual letters and communications from certain Plaintiffs and others within a reasonable amount of time after Defendant's conduct was publicly disclosed.

407.    Defendant had actual knowledge of the defective and dangerous condition of the CAEv2 and failed to take any action to cure those conditions.

408.    Plaintiffs relied upon Defendant's misrepresentations and omissions in deciding to use the CAEv2 instead of another hearing protection device.

409.    By reason of the fraudulent and unlawful acts engaged in by Defendant, and as a direct and proximate result thereof, Plaintiffs have sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## COUNT XIV
## LOSS OF CONSORTIUM

410.    Plaintiffs restate the allegations above as if fully rewritten herein.

411.    At all relevant times, certain Plaintiffs were married to spouses.

412.    As a result of the injuries and damages sustained by certain Plaintiffs, their spouses have suffered the loss of care, comfort, society, and affection from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## COUNT XV
## UNJUST ENRICHMENT

413.    Plaintiffs restate the allegations above as if fully rewritten herein.

414.    Defendant have enjoyed numerous revenues from sales of the CAEv2.

415.    It is unjust to allow Defendant to earn revenues and retain the benefits and profits from the CAEv2 while Plaintiffs suffered serious injuries and/or sequelae thereto, including but not limited to hearing damage and/or tinnitus.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## COUNT XVI
## PUNITIVE DAMAGES

416.    Plaintiffs restate the allegations above as if fully rewritten herein.

417.    Defendant have acted willfully, wantonly, with an evil motive, and recklessly in one or more of the following ways:

a.     By failing to disclose material facts regarding the dangers and serious safety concerns of the CAEv2;

b.     By concealing and suppressing material facts regarding the dangers and serious health and/or safety concerns of the CAEv2;

c.     By failing to disclose the truth and making false representations with the purpose of deceiving and lulling Plaintiffs into using and relying upon the CAEv2;

d.     By falsely representing the qualities and characteristics of the CAEv2 to the public and Plaintiffs; and

e.     By filing a baseless patent infringement lawsuit, misusing the JWOD program, and lodging frivolous protests to solicitation awards in order to block Moldex from selling BattlePlugs—a reasonable alternative design to the CAEv2.

WHEREFORE, Plaintiffs demand judgment against Defendant and request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and other further relief as the Court deems equitable and just.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

418.    Through the exercise of reasonable diligence, Plaintiffs did not and could not have discovered that the CAEv2 caused their injuries and/or sequelae

thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiffs.

419.    Plaintiffs did not suspect and had no reason to suspect that the CAEv2 caused their injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

420.    In addition, Defendant's fraudulent concealment has tolled the running of any statute of limitations.

421.    Through their affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the risks associated with the defects of the CAEv2 and that the device caused their injuries and/or sequelae thereto.

422.    Through their ongoing affirmative misrepresentations and omissions, Defendant committed continual tortious and fraudulent acts.

423.    As a result of Defendant's fraudulent concealment, Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendant's acts and omissions.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims in this action.

## PRAYER FOR RELIEF

74

WHEREFORE, Plaintiff respectfully requests:

i.      That process issue according to law;

ii.     That Defendant be duly served and cited to appear and answer herein, and that after due proceedings are had, that there be judgment in favor of Plaintiff and against Defendant for the damages set forth below, along with court costs and pre-judgment and post-judgment interest at the legal rate;

iii.    Pain and suffering (past and future);

iv.    Wage loss (past and future);

v.     Loss of earnings and loss of earning capacity;

vi.    Medical expenses (past and future);

vii.   Loss of enjoyment of life (past and future);

viii.  Mental anguish and distress (past and future);

ix.    Disfigurement (past and future);

x.     Physical impairment (past and future);

xi.    Costs and expenses incurred in this litigation, including but not limited to expert fees and reasonable attorneys' fees;

xii.   Any and all applicable statutory and civil penalties, as allowed by law;

xiii.  Punitive or exemplary damages in such amounts as may be proven at trial;

xiv.      Pre- and post-judgment interest on any amounts awarded, as allowed

            by law; and

xv.       Any such other and further relief as the Court deems just and proper.


## ACKNOWLEDGMENT

The undersigned acknowledge sanctions may be imposed under Minn. Stat.

§ 549.211.

Dated: October 7, 2022                              Respectfully Submitted,

                                             *s/Jason B. Epps*
                                             Jason B. Epps, MN Bar #0395925
                                             Partner
                                             The Gori Law Firm
                                             156 N. Main Street
                                             Edwardsville, IL  62025
                                             Phone:  618-659-9833
                                             Email:  Jason@gorilaw.com


                                             **ATTORNEYS FOR PLAINTIFF**